# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

FWU3U354

U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FORT WORTH DIVISION
FILED

2021 JUN -3  PM 4: 21

DEPUTY CLERK ___ 80

Jennifer T. Julian
**Plaintiff**

v.

**4-21CV-718 O**
Civil Action No.

Louis DeJay, Postmaster General
**Defendant**
United States Postal Service
(Southern Area) Agency

## COMPLAINT

See page 1 and 2 for the 13 specific complaints.

Plantiff: self, Jennifer Julian
Witnesses: Sharon Drummond, RIF PM, Cindy Mihoi, RIF PM,
P.P. Rita Roscoe, counslor, Dr Nick Kong, heart Doctor, Pr Altrea Gonzalez, GP
Frank Harrison, APO PM, Deena Grant, PM

          Postal Service Employees and Managers (southern Area)
Defendants: Boss, Sid Wim, Leanne Farney PM, Louisa Ben, PM, Carolyn Gibbs, Clerk
Christine Melton, sup, JA Williams, P.M., John Rizzano, PM
Deanna Newsome, Clerk Union Representative

---

\* Attach additional pages as needed.

| | |
|---|---|
| Date | 06/03/2021 |
| Signature | Jennifer T. Julian |
| Print Name | Jennifer T. Julian |
| Address | PO Box 124 |
| City, State, Zip | Scotland, Texas  76379-0124 |
| Telephone | (940) 733-2541 |

Sir:

Page 1

6/3/21

I am asking for $850,000.00 in compensation and punitive damages by the continual harrassment, retailiation, and discrimination that I receives continually by management within the Postal Service. I have 112 medical Documentations that were submitted over a course of almost 4 1/2 years since all of this started. The money requested is for the extra monthy medical expenses and the money I lost from being taken off the detail I was on in 2017, which was an extra $50,000.00 per year times 10 years till my retirement date. Many, Many employees are on Details for years, But Because of Mr. Wihn's retailiation and discrimination, not to mention harrassment over these years, he took me off the detail within 2 days of receiving his position, and paid 'other' people to fill these positions by paying them more money and perdieum to do my same job. I had decreeses costs, overtime, and grievances being filled by over 60% while I served there,

The post office was given step-by-step instructions (see enclosure) on changing and updating the RIF impacted Postmasters schedules in TACS and WEBCOINS so they would not owe us out of schedule pay. He refused to do that and made the managers under his direction, stop paying it to us. So, they started taking money out of my check without issuing me a letter of Demand, which is against the labor laws. Me, along with another RIF Postmaster that faced the same treatment I was receiving, (she is 72), pulled our grievances out of the union and went before 2 different judges, and 2 different Heads of Labor Relations for the post office, and they all decided that the Post office Did Not have a case against either one of us and they were ordered to pay the money back to us that they had taken out of our checks illegally and pay us the Back pay we are Due. (see judge decision enclosed)

The people out there and have yet to receive the Back pay Due - Myself $43,000.00 plus And my other RIF Postmaster is $143,000.00. Her schedule was more Dis configured than mine. To this day, "they" Keep saying they are working on it!

I am just asking and always asked to Be treated with respect and Dignity By the postal service. With Mr. Winn as the Manager, this has not happened. Other Postmasters have lost their jobs and Been Demoted Because of the way they treated me, as well as Mrs. Drummond.

Over the last, almost 5 years now, this case has not only effected my family, my husband, my four Sons, their wives, My grandchildren, my deteriorating health, my Mental health, as well as my retirement, But also has made me unsecure about a job/career I have devoted my whole life too - working for them in some way, shape, or form since 1987 And went full - time in 1999. 34 years And over 20 of those were in a management position.

I took the Down grade to stay home in my home town and Be closer to my family!

Please, Please, look into this case and see how unprofessional And harrassed I was truly treated over these years. Any and All consideration of these matters would Be greatly Appreciated!

Thank you - Jennifer T. Julian 940-733-2541

*page 1*

## DECISION ON REQUEST FOR RECONSIDERATION

Complainant timely requested that the Equal Employment Opportunity Commission (EEOC or Commission) reconsider its decision in EEOC Appeal No. 2019005244 (October 15, 2020). EEOC regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision issued pursuant to 29 C.F.R. § 1614.405(a), where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. See 29 C.F.R. § 1614.405(c).

Complainant worked as a Sakes & Services Distribution Associate at the Post Office in Scotland, Texas. Complainant filed an EEO complaint alleging she was discriminated against on the bases of disability and age (50) when:

1. On a daily basis since September 2016, the Post Office Operations Manager (POOM) and her Postmaster (PM1) did not accommodate Complainant's medical restrictions in regard to work hours;

Jennifer Julian
PO Box 124
Scotland, TX    940-933-2541
76319

*Page 2*

2

2021001005

2. On September 2, 2017, POOM took Complainant off a detail to which she had been assigned since February 25, 2017;

3. On October 17, 2017, and again on April 23, August 6, August 24, 2018, and February 7, 2019, PM1, POOM, and several coworkers harassed Complainant;

4. On April 23, 2018, POOM questioned Complainant's integrity;

5. On April 23 and August 24, 2018, POOM and PM1 accused Complainant of wrongdoing;

6. In emails dated June 11, August 21, September 4, 2018, and again on February 5, 2019, PM1 instructed Complainant to perform custodial work outside of her job description;

7. In emails dated July 31 and August 21, 2018, POOM and PM1 told Complainant that she could not speak to anyone;

8. Over the course of eleven pay periods between August 2018 and February 2019, POOM and PM1 denied Complainant out-of-schedule (OOS) pay;

9. On August 7, 2018, PM1 talked negatively about Complainant's work performance; and

10. On October 1, 2018, PM1 notified Complainant via certified letter that her bid assignment had been abolished.

Complainant further amended her complaint alleging she was subjected to reprisal when:

11. On January 4, 2019, PM1 and a more senior level Postmaster (PM2) demanded that Complainant sign paperwork allowing the Agency to recover OOS pay she had previously received;

12. On January 8, 2019, Complainant became aware that the payroll office had processed an improper payroll deduction in the amount of $155.28 from her then current paycheck; and

13. On February 22, 2019, Complainant became aware that she had improperly been charged 32 hours of leave without pay for hours she had actually worked.

*Jennifer Julen*
*PO Box 124*
*Scotland, TX*
*76379*

*940-733-2541*

Jennifer T Julian
P O Box 124
Scotland, TX 76379-0124


April 14, 2021
+

Postmaster General DeJoy
475 L'Enfant Plaza  Room 4012
Washington  DC  20260-2200


Honorable Postmaster DeJoy:

It is with great sadness in my heart, that I am even having to address this demeaning situation with you. I have had to file two formal EEO cases against the Postal Service. I have endured much harassment, retaliation and discrimination against me.

The No Fear Act, the Zero Tolerance policy, the Whistleblower Act and the Social Media Act were not adhered to for the last 4 and 1/2 years by the Postal Service as evidence that I had presented to them over these last few years.

The MPOO, Mr Sid Winn, made it his choice to be sure that the managers he had under him, carried out these malicious acts against me.

The Final Agency Decision (FAD) admits that I was retaliated against, discriminated against, harassed and mistreated by the Postal Service and its managers, BUT had no comparator in my office to compare me with. This would be impossible since I am the only NTFT Clerk assigned to this office during POST Plan. This has not only affected my career but also my family and my health, not to mention my mental well being. I have 112 medical documentations and Doctors notes to back this up for the last 4 1/2 years. I have been with the Postal Service in some position since 1986, as a Casual Clerk, HCR Driver, City Carrier, PMR, PTF Clerk, OIC of offices, Supervisor of a Level 22 office and Postmaster for 12 plus years. I was also Business Connect Coordinator for the Southern Area, Ft Worth District, and brought the FTW District to the # 1 Spot in the Nation in a period of 8 months. I received numerous awards and notoriety throughout the Southern Area for a job well done. I have always given 100% of myself to the Postal Service and am highly respected and regarded throughout the Area.

When I was supervising at Stephenville PO, Mr. Winn achieved the MPOO2 position – not just as a fill-in. He came the next day to Stephenville and removed me from that temporary position and sent me back to Scotland. I asked why, was I not doing a good job? He replied, "because I can". He put in a lady that drove twice as far, thus doubling travel costs for the Postal Service. However, he later stated during the IMIP that was conducted by all his "friends: within the Post Office, he stated that details only last 90 days and I had gone over that timeframe. This makes no sense because LOTS of people stay on these details for years.

Then along came Post Plan 2016. I personally chose to remain in my home office as the NTFT Clerk until I vacate the position: die, resign, promote or retire. I did this because I had the biggest Town Hall meeting in the nation for small town USA, about 125 attended – from a population of 400 residents. The customers made the choice for me. It just so happens that my

harasser was the man who ran that meeting, was MPOO2, Mr Sid Winn, FTW District – my Boss. He was only a Postmaster back then. After that day he never treated me the same.

He came to my office and accused me of being a drunk. (See email documentation) He told me he was not going to change the schedules because it did not matter.  He was acceptable of the social media messaging one of my customers by the EX Postmaster and her clerk, after hours, at a questionable place. He would send a clerk 62 miles round trip, to cut me out of 15 minutes during lunch – to get change for my office.  It was 10 miles round trip for me. Blatant discrimination went on daily.

He sent a certified letter abolishing my position as a NTFT clerk in Scotland, which was against 2016 Post Plan contract, then 60 days or so later verbally said to ignore that letter.  It was just a threat and harassment tactic to try to get me to leave the position so that he could reduce the office hours.

I have filed for the OOS pay that is owed to me because the Judicial Judge out of Virginia and the Head of Labor Relations out of Tampa, FL both decided that the PO did not have a case against me.  They were ordered to pay back the money that they had illegally withheld from my pay check.

As a matter of fact, they even garnished my wage, originally, without even issuing a letter of demand to me, which is against the labor laws.

Postmasters were fired and/or demoted because of the harassment they dished out to me – but they were doing his bidding.

My Attorneys, Pines Federal, sent a rebuttal/reconsideration to the Office of Federal Operations that they never acknowledged but just denied and stuck with the Postal Service and NEVER even sent them a letter of the decision that they had rendered against my case. Even though the attorneys were spot on with their discoveries that they presented.

I have an impeccable record with the Postal Service and did not deserve any of this mistreatment.  I am sending you all this information and documentation for you to review in depth and see how I was mistreated by Postal Management.

It has caused me major health issues, that have affected me for a lifetime.

Please, please, look into this case, before I have to file a Federal lawsuit for the OOS back pay owed to me and compensatory damages for the harassment I have endured. It would be a Class Action Lawsuit because it was against more than just me, during this Post Plan for RIF Impacted Postmasters.

I have a name and a face.  It is Jennifer T Julian of Scotland, TX.  76379


Jennifer T Julian
EIN 02305416

940-733-2541

## COMPLAINANT'S REQUEST FOR RECONSIDERATION

Complainant Jennifer Julian hereby files a request for reconsideration of the EEOC's Office of Federal Operations' (OFO) denial of her appeal in the aforementioned case.

### ARGUMENT

1. Incident 1: Failure to Accommodate

In its denial of Ms. Julian's appeal (Ex. 1), the OFO stated that there were "no indications in the record that she had utilized the reasonable accommodations process or had otherwise let management officials know that she needed the time limits to be extended as a reasonable accommodation," and noted in particular that "while Complainant told PM1 [her Postmaster] that she had medical issues, she did not provide PM1 with medical documentation establishing her need for an accommodation."

The OFO admitted that the Post Office Operations Manager (POOM) was made aware of Ms. Julian's condition in September 2016 and that her restrictions consisted of standing and walking only between 10 and 15 minutes per hour. Further, she had been receiving those accommodations since 2002. Yet, on October 1, 2016, a new workplan was put into place which required her to perform her closure duties within 15 minutes, in which all but one type of duty specifically involved standing and/or walking. She stated that she could therefore not do the office closure duties at the pace that management had dictated due to her age and her condition. She stated that the accommodations she needed—and that she had been receiving until October

1

1, 2016—was to be allotted adequate time to perform her job duties within her restrictions on standing and walking. Critically, *Ms. Julian told PM1 and POOM that the 15-minute time restriction was unrealistic.* IR 238-39, 256-57, 277-78, 282-83 (See Ex. 2).

OFO then cited POOM's statement that Ms. Julian never informed him that she had any medical restrictions or that such restrictions were not being accommodated, citing IR 634-35; OFO also cited that PM1 stated that while Complainant had told her that she had medical issues, Complainant did not provide her with documentation or request an accommodation, citing IR 663-64, 681, 696.

In order to establish a *prima facie* claim of failure to accommodate, a complainant must show that 1.) she has a disability, 2.) she is fully qualified and able to perform the essential functions of her position with a reasonable accommodation, and that 3.) her employer failed to reasonably accommodate her disability. *See* 42 U.S.C. § 12112. Items 1.) and 2.) are not in dispute.

When requesting reasonable accommodation, an employee is not required to use the "magic" words "reasonable accommodation." Instead, the employee need only inform the Agency that he or she needs an adjustment or change at work for a reason related to a medical condition. *See* Triplett-Graham v. U.S. Postal Serv., EEOC Appeal No. 0120044720 (Feb. 24, 2006). The OFO also cited binding law that "[w]hen making an accommodation request, an employee need not use the words 'reasonable accommodation' but should make clear *that he needs an adjustment or change at work for a reason related to a medical condition.*" Alberto P. v. Dep't of Health & Human Services., EEOC Appeal No. 0120152432 (Oct. 31, 2017) (emphasis added). Most critically, when the agency has knowledge of facts and circumstances that provide linkage between an employee's medical condition and workplace problems, it has an obligation to investigate that linkage and provide any necessary accommodations. Hadley Guide to Federal Sector Equal Employment Law and Practice: Failure to Request. Per Enforcement Guidance: Reasonable Accommodation, at p. 8. "To request accommodation, an individual may use 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'". *See* Patterson v. Secretary of Air Force, EEOC No. 03970123 (1998).

Here, Ms. Julian informed the Agency that she needed an adjustment or change at work for a reason related to a medical condition. She specifically told POOM and PM1 that the new 15-minute time restriction that forced her to perform activities that were nearly all involving standing and walking within 15 minutes was "unrealistic." IR, p. 257 (See Ex. 2). Her restrictions regarding standing and walking were in her Official Personnel File (OPF) as a modified job assignment from September 26, 2002, which only allowed her to stand and/or walk from 10 to 15 minutes per hour. IR, pp. 238, 277.

Thus, Ms. Julian "informed the Agency that she needed an adjustment or change at work for a reason related to a medical condition" when she told her managers that standing and walking at such a rushed pace was "unrealistic." Given her statement, the Agency had knowledge of facts and circumstances that provided a linkage between her medical condition and workplace problems. The Agency had an obligation, then, to investigate the linkage and provide any necessary accommodations. The Agency could have put two and two together: they could have, and *should* have, understood the plain meaning of Ms. Julian's statement that this specific standing and walking work was "unrealistic" *because* it conflicted with her longstanding documented medical restrictions concerning walking and standing.

Ms. Julian should not be penalized with an unfavorable Final Agency Decision (FAD) simply because the EEOC investigator in this case did not properly ask questions to discern

exactly how in-depth did Ms. Julian use language to request reasonable accommodation. More importantly, the law clearly places the burden on an Agency to investigate reasonable accommodations once a disabled employee has adequately put them on alert that they are struggling in their job position due to medical restrictions. Ms. Julian had a long-standing accommodation that the Agency violated, and Ms. Julian immediately proceeded to tell her managers that it was "unrealistic" to work outside of that medical accommodation. That evidence alone is sufficient to show that—given all of the circumstances, including the Agency's longstanding knowledge of her need for accommodations and limitations around walking and standing—her statement that she could no longer perform *walking and standing activities* so quickly because it was "unrealistic" was sufficient to trigger the Agency's responsibility to investigate accommodations.

To hold that Ms. Julian did not use words that were "magic enough" and formalistic enough to saying "reasonable accommodation" would be in violation of the ADA's purpose, which is to make sure that disabled employees that need an adjustment in working conditions due to disability are accommodated by their employers—especially when the law also requires that Agency's proactively investigate need for accommodation once they have sufficient knowledge that accommodation is needed. The facts show that the Agency had such knowledge. Moreover, Ms. Julian likely made more concrete indications and requests for accommodations, and it should not be assumed that she did not make such indications, simply because of the way that the EEOC investigator failed to ask her specific follow-up questions about how she requested accommodation.

Thus, Ms. Julian—by and through the undersigned—requests that the Final Agency Decision in case be overturned upon a more thorough exploration of facts regarding her request for accommodation and the Agency's failure to provide that accommodation; within the guidelines of the legal authority just cited above.

2. Hostile Work Environment

To establish a claim of discriminatory harassment that creates a hostile work environment, a complainant must show that 1.) she is a member of the statutorily protected class; 2.) she was subjected to harassment in the form of unwelcome conduct involving the protected class; 3.) the harassment complained of was based on the statutorily protected class; and 4.) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment." Gibson v. Department of Homeland Security, EEOC No. 0720060079 (EEOC OFO 2008), *citing* Humphrey v. U.S. Postal Service, EEOC No. 01965238 (EEOC 1998); Roberts v. Secretary of Transportation, EEOC No. 01970727 (2000), *citing* Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982); *see also* Hensley v. Secretary of Commerce, 01943469 (1996). Additionally, an Agency can be subject to vicarious liability for unlawful harassment perpetrated by a supervisor with immediate or successively higher authority over a complainant, and there is no defense to liability if the harassment culminates in a tangible employment action. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998). The harasser's conduct should be evaluated from the objective viewpoint of a reasonable person in the victim's circumstances. Enforcement Guidance on Harris v. Forklift Systems Inc., EEOC Notice No. 915.002 (March 8, 1994).

3

In Hensley, the complainant demonstrated the harassing conduct was related to alcoholism when coworkers placed small plastic alcohol bottles and cartoons about alcoholics on his desk, and thus the harassing conduct was related to the complainant's disability by its very nature. Here, too, Ms. Julian can show that the harassment she suffered was related to her membership of protected classes by the very nature of those acts.

The OFO analyzed claim (3) occurring between October 2017 and February 2019 in which POOM, P1, and CW1 sent inflammatory emails to Ms. Julian. Please note that claim (3) actually involves at least five separate instances of this behavior and also included PM1 and POOM, both supervisors. Those specific dates include the following: October 7, 2017; April 23, 2018; August 6, 2018; August 24, 2018; February 7, 2019.

To reiterate this string of harassing events:

1. On October 17, 2017, CW1 sent a belittling email to Ms. Julian and POOM *and* several other coworkers. (Ex. 1). *Additionally*, on October 17, 2017, Ms. Julian contacted Ms. Farney (PM1) and her union representative—who is CW1, Deanna Newsome, who was acting in an assistive role regarding union issues—regarding questions about her job duties and pay and requested a meeting with a union steward to help her understand portions of the contract. *In response*, PM1 sent an email belittling her, and copied Mr. Sid Winn (POOM) and various APWU officials. *See* Ex. 3- Final Agency Decision (FAD), Agency Case No. 4G-760-0086-18, p. 23; Ex. 4, ROI Agency Affidavits, IR pp. 636. Also, a few days earlier, on October 13, 2017, PM1 emailed Ms. Julian and cc'd POOM accusing Ms. Julian of using excess hours. Ex. 3, FAD, p. 17; Ex. 9, IR p. 74.

2. On April 23, 2018, POOM came to Ms. Julian's office and asked her if she had gotten a DUI ticket. Ex. 1. He *also* stated that "he heard from several other postal employees that she might have a drinking problem *and* may have gotten a DUI." Ex. 3, FAD, p. 20 (emphasis added). Ms. Julian then told Mr. Winn she did not know what he was talking about and to inform the other employees if they had questions about her personal life, they should ask her themselves. Id.

3. On or around August 6, 2018, Postmaster Farney (PM1) sent a disparaging email accusing Ms. Julian of "waiting until the last minute" to print placards, getting out of her office too slowly, demanding that she leave her office by no later than 4:30 and that "5 o'clock is not acceptable," and that she was arranging an audit to look at different practices including to "address the issue of you not being able to be done and gone in the 15 minutes." IR, p. 249, Ex. 10, IR p. 22. Regarding this incident, Ms. Julian could not close a prior task until 4:15 due to a large last-minute mailing that required her to print additional placards due to the heavy volume that she had to accept last minute. Strikingly, POOM contradicted his own testimony whereas on March 12, 2019 he stated that Ms. Julian had not told him of the incident from that day, whereas during a later investigation on March 25, 2019, he admitted that Ms. Julian *had* informed him of that incident, and that he had even followed up on her report. Ex. 4, IR p. 652.

4. On or about August 24, 2018, Ms. Julian experienced harassment whereby PM1 accused Ms. Julian of mistreating a customer. Ex. 1.

4

5. On February 7, 2019, CW1 (DeAnna Newsome) sent Ms. Julian an email criticizing her of "questioning every single little thing." See Ex's. 1, 3. Specifically, Ms. Newsome—who was *supposed* to be acting as her union representative as the time—sent an email in which she also refused to help her with an issue. Ex. 4, IR p. 636.

The OFO cited case law that antidiscrimination statutes forbid only behavior so objectively offensive as to alter the conditions of the victim's employment. <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S. 75, 81 (1998); <u>Harris.</u>, 510 U.S. at 17, 21 (1993). The undersigned respectfully points out two signed medical letters from Ms. Julian's physicians, dated March 6 and Marc 11, 2019, occurring right after the last date of harassment noted just above. See Ex. 5, Medical Evidence, IR pp 493-34. The letters specifically stated that Ms. Julian 1.) developed anxiety and depression over two years due to work-related stress, 2.) suffered worsening hypertension due to work-related stress, 3.) suffered worsening bilateral knee pain due to being required to stand on her feet for prolonged periods of time over two years, and 4.) suffered a deterioration in health due to mental stress. Thus, the harassment that Ms. Julian suffered was so objectively offensive as to alter the conditions of Ms. Julian's employment in that she suffered a work-related mental deterioration and deterioration in health due to the emotional trauma of suffering harassment.

Additionally, as in <u>Hensley</u>, many of the instances of harassment listed above were directly related to Ms. Julian's protected classes, and as such the Agency's actions constitute *prima facie* evidence of harassment creating a hostile work environment based on the very nature of Ms. Julian's protected classes of disability (bilateral foot strain) and age (50). Ms. Julian's disability prevents her from standing and/or walking for more than 15 minutes at a time, as has been thoroughly demonstrated above. Specifically, incident 1.) of the list above involved the Agency accusing Ms. Julian of taking too long to close up; yet the record clearly reflects that she struggled to close up as quickly as the Agency demanded because the Agency was forcing her to close up in a way that violated her medically necessary accommodations by forcing her to stand and/or walk for too long at a time. Thus, this harassing behavior specifically targeted Ms. Julian's disability by creating a threatening atmosphere in which the Agency purposefully made Ms. Julian feel insecure in her position *because of her disability*.

The OFO mischaracterized these and other incidents of harassment by analyzing them as isolated incidents. However, incidents of harassment should be characterized as a whole pattern. *See* <u>Meaney v. Dep't of the Treasury</u>, EEOC Request No. 05940169 (Nov. 3, 1994) (the "pattern aspect" of a complainant's allegations should not be ignored and defined in a piecemeal manner where an analogous theme unites the matter complained of); *see also* <u>Wegener v. Secretary of Interior</u>, 01A03847 (2003)("By separately listing each incident alleged in complainant's separate complaints, the issues identified by the agency represent an erroneous piecemeal method for addressing the underlying claim of a pattern of ongoing harassment) (*citing* <u>Reid v. Department of Commerce</u>, EEOC Request No. 05970705 (April 22, 1999)); *see also* <u>National Railroad Passenger Corp. v. Morgan</u>, 122 S. Ct. 2061 (June 10, 2002) (Title VII is violated where workplace is "permeated with 'discriminatory intimidation, ridicule, and insult'" that is sufficiently severe or pervasive to create an abusive working environment.); *see also* <u>Hubbard v. Secretary of Homeland Security</u>, 0120053612 (2007)("The Commission has held that an agency should not ignore the pattern aspect of a claim and define the issues in a piecemeal manner where an analogous theme unites the matters contained therein.").

Thus, incident 2.) from the list above falls under the same pattern as all instances of

harassment in this case—namely, management questioning—and getting and/or allowing coworkers to question—Ms. Julian's work efficacy based on a perception of poor health. While having a perceived drinking problem is not necessarily directly related to bilateral foot strain, it is related to an overall perception that Ms. Julian had health problems as an older individual. As noted, Ms. Julian's physicians affirmed that her overall health—including hypertension issues, mental anxiety and depression, and worsening bilateral knee pain—all worsened due to work-related stress that she suffered. Ex. 5. Thus, harassing comments pertaining to incident 2.) from this list should be considered in an "overall pattern" of an "analogous theme" of the Agency pressuring, humiliating, and intimidating Ms. Julian due to her worsening health conditions that were exacerbated by her advancing age.

Regarding incident 3.) of the above list, the Agency's explanations and statements are riddled with inconsistencies and credibility issues. First, POOM lied when during a first interview, he stated that Ms. Julian did not alert him to harassment that occurred on August 6, 2018; he admitted in a latter part of the investigation that Ms. Julian had alerted him to this fact. See Ex. 4, IR p. 652. Additionally, Ms. Julian had a legitimate, regular reason for being late just one time with filling out placards, in that she had gotten a large order at the last minute before closing off a certain part of her task list before getting to the placards. A *prima facie* case of discrimination and hostile work environment can be created with circumstantial evidence. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993); Texas Dep't of Comm. Aff. v. Burdine, 450 U.S. 248, 252-53 (1981)). Pretext can be demonstrated by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Agency's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence. Opare-Addo v. U.S. Postal Serv., EEOC Appeal No. 0120060802 (Nov. 20, 2007), req. for reconsid. den'd EEOC Request No. 0520080211 (May 30, 2008). Given the Agency's lack of credibility, self-contradiction, and severe overreaction to one instance of Ms. Julian being late to close up for a rational and normally occurring reason, the OFO should find that she met her *prima facie* burden regarding harassment in this instance, and should further consider overturning the Agency's final decision based on these considerations.

Regarding incident 4.) of the above list, the Agency admitted in its FAD that Facebook posts dated August 24, 2018, sent by Carolyn Gibbs (CW) to an unidentified Scotland Post Office customer, in which Ms. Gibbs a.) referenced a large mailing that the customer had that day, b.) mentioned that Ms. Julian had been off the clock an extra 15 minutes handling that order, and c.) inquired whether the Complainant was nice to her when she was there. Ms. Gibbs also asked the customer to contact her the night before she has another large mailing because she wanted "to come to Scotland and surprise Jennifer [Julian] *to help her*," and added a winky-face, implying ridicule of Ms. Julian for being slow. Ex. 3, FAD, p. 21, Ex. 7, IR p. 486. Ms. Julian also noted to POOM that "the customer had asked her whom she needed to report this [incident] to," showing that the customer also found this to be a shocking act of harassment. Ex. 7, IR p. 486.

Thus, the incident *again* falls into the same pattern of the Agency, management, and coworkers together creating a hostile atmosphere in which Ms. Julian continued to be labelled as "needing help," specifically as needing help with large mailings, implying that due to her age and disabilities, she was unable to keep up with regular duties that included large mailings. Similarly, regarding incident 5.) of the list above, Ms. Julian's supposed union representative accused her of "needing help with every little thing." As in Henley, the harassment sprung

6

directly from Ms. Julian's protected classes, and as in the multiple cases cited above, the OFO should consider this incident as part of an analogous pattern of harassment—rather than in a piecemeal fashion—so as to overturn the agency's final decision in this case.

Regarding the OFO's statement that acts committed by CW's should be not be considered as part of Ms. Julian's harassment claims, the Commission in Lashawna C. v. Secretary of Labor, 0720160020 (2017) rejected the notion that a "pattern of conduct" or relatedness among incidents could not be established where the same alleged harasser was not involved in each incident. Additionally, even when various individuals are directly or indirectly responsible for any adverse actions, an Agency is nevertheless liable under a cat's paw theory. See Staub v. Proctor Hospital, 111 LRP 14837, 131 S. Ct. 1186 (2011). Thus, the OFO should reconsider its analysis of harassment involving CW's under these binding legal precedents to find that those incidents as well fit into the pattern of overall harassment that Ms. Julian suffered.

3.  Disparate Treatment

Regarding a disparate treatment analysis in this case, the OFO cited that pretext can be demonstrated by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Agency's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence. Opare-Addo v. U.S. Postal Serv., EEOC Appeal No. 0120060802 (Nov. 20, 2007), req. for reconsid. den'd EEOC Request No. 0520080211 (May 30, 2008). The undersigned also noted that a *prima facie* case of discrimination and hostile work environment can be created with circumstantial evidence. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993); Texas Dep't of Comm. Aff. v. Burdine, 450 U.S. 248, 252-53 (1981)).

The OFO found that the Agency articulated legitimate reasons for remaining claims (6), (7), (8), (10), (11), (12), and (13). However, as above, the OFO looked at these claims as piecemeal incidents when they should have considered them as part of an overall pattern of disparate treatment. Had OFO done so, they would have found the Agency's proffered reasons to be weak, implausible, inconsistent, incoherent, and full of contractions, such as to merit a reconsideration of all evidence in this case in Ms. Julian's favor. Additionally, Ms. Julian has already articulated strong evidentiary reasons that show why the Agency's proffered reasons were mere pretext.

Regarding incident (6), according to a settlement agreement between the USPS and the APWU RE: Q10C-4Q-C 15300701 / HQTC20150833 dated 02/4/2016: "Question 5. Will clerks be required to perform custodial duties between waiting on customers? Answer: NO." See Ex. 6, IR pp. 252-53. Ms. Julian was working as a clerk, and the Agency violated the prior binding settlement agreement by forcing her to work custodial duties between waiting on customers. Thus, the Agency's proffered reason completely contradicts its own policy, the OFO should find pretext here, and the OFO should overturn the FAD regarding claim 6.

Regarding incident (7), the OFO should not have analyzed this incident in piecemeal fashion but should rather have considered it as part of a pattern of disparate treatment involving the remaining incidents in this case. Here, PM1 communicated POOM's directive that Ms. Julian was only to bring her issues to PM1 first. See Ex. 7, IR p. 114. Yet, only a month and a few days later—in September of 2018—Ms. Julian was forced to communicate with POOM directly due to PM1 harassing her and slandering her to a customer, and incident which

occurred on August 24, 2018 (Claim 9). Just days apart from the harassing incident that occurred August 24, 2018 and Ms. Julian's plea to POOM in September of 2018, POOM and PM1 *again* told Ms. Julian that she was restricted to *only* reporting to PM1. See Ex. 3, FAD p. 19. The OFO should have considered that Agency management was scheming to restrict Ms. Julian from being able to report actions of her harasser, PM1. Furthermore, Ms. Julian had been reporting to many individuals in upper management before the Agency—especially PM1—began harassing her, and would continue to harass her beyond the August 2018 incident, including into incidents encompassing harassment and aggression that Ms. Julian suffered right up to when filed this complaint. Thus, when all of these facts are considered as a whole—rather than in piecemeal fashion that causes them to lose their overall import—they support a finding that the Agency in this incident meant to silence Ms. Julian from reporting harassment from P1, especially given that P1 was currently harassing Ms. Julian just as incident (7) occurred and would continue to harass Ms. Julian soon after incident (7) occurred.

Circumstantial evidence of discriminatory animus may include suspicious timing. Sambrano v. Department of the Navy, (N.D. Ill. 2010). Under McDonnell Douglas, a complainant can establish a prima facie case by presenting enough evidence to raise an inference of discrimination. The agency may then attempt to rebut the complainant's prima facie case by articulating a legitimate, nondiscriminatory explanation for its action. If the agency provides such an explanation, the complainant can still prevail by establishing by the preponderance of the evidence that the agency's stated reason for its action is pretext for discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Here, Ms. Julian can raise an issue that by the preponderance of the evidence, the Agency's stated reasons for muzzling her communication with POOM was only such that she would be forced to have to only report to one of her main harassers, PM1. Circumstantial evidence raises an issue that by the preponderance of all evidence—and looking back in retrospect at *all* evidence in the case—the Agency meant to throttle Ms. Julian's ability to report harassment that PM1 had just committed and was planning on committing again.

Regarding incident (8), Ms. Julian has supplied many instances of evidence in her August 12, 2019 Appeal to the Final Agency Decision. (Ex. 11, Appeal to Final Agency Decision).

She has already listed the following pieces of evidence that show how the Agency's purported reasons for denying her OOS pay over the course of eleven pay periods between August 2019 and February 2019—for a total loss of $1,070.72—were all pretextual:

1. PM1 and POOM contradicted each other's statements regarding who authorized the decision to cease OOS payments. POOM also directly contradicted himself on whether or not he consulted with PM1 regarding this decision.
2. PM1 and POOM cited Article 8.4.B as a basis for their decision, but that article only addresses overtime (OT) pay but not OOS pay. OOS pay is addressed in ELM Section 434.6, relevant to NTFT clerks, and Ms. Julian was an NTFT clerk.
3. POOM averred that Ms. Julian was notified on her PS Form 50 her job hours, but the PS 50 does not indicate scheduled hours.
4. In an email sent August 7, 2018, PM1 stated she still approved and paid Ms. Julian OOS pay for four weeks spanning August of 2018 through February of 2019.

Given these facts, PM1's statement, quoted in OFO's appeal denial (Ex. 1), emerges as much

more suspicious: "You are not entitled to the OOS you are claiming...Even though [the payroll system] has reflected a different time in the past for your reporting times, this does not entitle you to OOS pay. If you feel this is in error then please feel free to contact the union on this." (Ex. 1). Here, PM1 admitted that Ms. Julian had been working hours that at least used to reflect deserved OOS pay. She also offered Ms. Julian to contact the union "if she felt this was in error," indicating uncertainty about the decision and a tacit admission that the statement was subject to controversy. These many instances of contradictions, weak and implausible reasoning, and incoherent statements relying on irrelevant policies and nonexistent statements in a position description raise the strong specter of pretext such that a reasonable factfinder *could* find them not worthy of credence.

Additionally, Ms. Julian cited in her appeal evidence that once PS1 was replaced by a new Office in Charge (OIC) since June 13, 2019, she was now receiving OOS pay worked each week for the hours outside of her job assignment; Ms. Julian was still working under POOM at the time as well. Thus, the strong specter of pretext is raised, as Ms. Julian received OOS before PS1 became her postmaster, and after PS1 was removed as her Postmaster, with POOM overseeing this the entire time. Thus, it is much more likely—especially given all of the inconsistencies and contradictions offered by the Agency, laid out above—that PS1 harassed and treated Ms. Julian disparately by denying her over $1,000.00 worth of deserved OOS time, rather than that this action was justified.

While this last piece of evidence constitutes new evidence past the time scope of the original investigation, the Commission routinely holds that new evidence will be considered on appeal if "there is an affirmative showing that the evidence was not reasonably available prior to or during the investigation." *See* EEO MD-110 at Chap. 9, § VI.A.3; Mana H. v. U.S. Postal Service, EEOC Appeal No. 2019002506 (Sept. 16, 2020). This evidence from June of 2019 could not have been available as the original investigation had already closed; as by May of 2019, Ms. Julian had already requested a final decision without a hearing. Ex. 1.

Regarding incident (10), the Agency's action in abolishing Ms. Julian's bid assignment simply violated policy and was not justifiable. Per ELM Article 37.4.B, an unassigned regular employee at USPS is entitled to their same hours after becoming unassigned unless USPS informs them of new hours *within 28 days if that employee becoming unassigned*. Ex. 2, IR p. 258. Because the Agency abolished this bid assignment anyway—thereby removing Ms. Julian's hours *after* the 28 days just mentioned—their action was wrong and was not supported by legitimate reasons. Thus, a proper disparate treatment analysis should apply to this incident.

4. Remaining Incidents

In February of 2019, Ms. Julian filed an amendment to her complaint and reported three additional incidents labeled incidents (11), (12), and (13) in OFO's appeal denial. Ex. 1. These incidents involved that PM1 and PM2 demand that Ms. Julian sign paperwork allowing the Agency to recover OOS pay that she had received, payroll improperly deducting $155.28 from her paycheck, and being improperly charged 32 hours of Leave Without Pay (LWOP) for hours that she had actually worked.

OFO characterized these incidents as inconsequential and averred that regarding incident (11) no manager forced Ms. Julian to sign any paperwork, and incidents (12) and (13) were apparently excusable because they did not involve any management official involved in

payroll processing errors.

Ms. Julian did file a grievance related to these issues, she filed a case with a USPS Judicial Officer, and by February 5, 2020, she had reached settlement with USPS in which the Agency *completely dropped their attempt to collect the debt at issue in incident (11) in this case.* See attached Ex. 12. As above, this evidence should be considered, as it arose after Ms. Julian requested a decision without a hearing in May of 2019 and could not possibly have been included in the earlier investigation.

In that grievance, which led to a USPS Judicial Officer proceeding, which led to completely favorable settlement, Ms. Julian noted that POOM and PM1 admitted that the hours posted in the TACS and WebCOINS systems were incorrect and needed to be corrected, but that those corrections had not been made since November of 2018. The grievance also contained paystub evidence that Ms. Julian began to receive OOS payments once again without question once a new OIC replaced PM1, indicating that the original demand letter at issue in incident (11) was wrongful, discriminatory, and based on disparate treatment; rather than being a legitimate managerial act.

Most significantly, the fact that the USPS settled *completely* in Ms. Julian's favor and totally dropped the debt charge at issue in incident (11) indicates that the Agency's pertinent actions were completely based on wrongful pretext, as the Agency was not able to enforce its demand letter to collect the pertinent debt after many months and rounds of legal procedure.

The OFO dismissed this incident merely because they characterized that no Agency manager forced Ms. Julian to sign anything. Whether or not that is true does not detract from the wrongfulness of the act. Here, OFO dismissed the incident by overemphasizing tangential aspects of the incident concerning whether or not Agency managers forced Ms. Julian to sign a letter. In actuality, the disparate treatment mainly involved the Agency burdening Ms. Julian with the extreme threat of owing a debt for thousands of dollars that she had earned through OOS hours; *and* for which she had no reason to suspect she would have to owe back, as evidenced by the following facts:

1. the Agency had been paying for those OOS hours for many years prior,
2. PS "protested too much" in an earlier related incident (8) regarding OOS by saying that the prior practice of the Agency paying Ms. Julian OOS was inconsequential, and if she had an issue with the new decision, she could grieve it,
3. in an email sent August 7, 2018, PM1 stated she still approved and paid Ms. Julian OOS pay for four weeks spanning August of 2018 through February of 2019, yet the Agency turned around and demanded Ms. Julian pay them back for OOS hours, and
4. *the Agency eventually settled completely in Ms. Julian's favor despite attempting through months of legal proceeding to enforce their wrongful debt attempt.*

Finally, there is sufficient evidence to impute these actions to the Agency as Agency managers including PM1 and PM2 served the original debt demand letter on Ms. Julian, and PM1 had earlier wrongfully disputed and contested Ms. Julian's use of OOS time as pertains to incident (8).

Additionally, OFO should have at least considered incident (11) as another instance of harassment. When Agency management demanded $3,316.56 of earned work hours from Ms. Julian—including OOS hours that she had rightly earned before PS1 became Postmaster over

her, and rightly earned once PS1 was removed from being Postmaster over her, and thus rightly earned in between—that act constituted severe, extreme threatening behavior that an objective employee in Ms. Julian's situation would have found to have created an intimidating, hostile, and offensive work environment.

Finally, OFO dismissed any possibility that POOM, PM1, or any other management official was involved in errors pertaining to incidents (12) and (13). Again, the OFO—by taking these acts out of the entire context and pattern of actions involving the entire complaint—too quickly sided with Agency managers' statements of complete noninvolvement. However, when looking at all of the facts in this complaint as a whole, a strong presumption arises that just as PM1 and POOM were implicated in other incidents involving payroll disputes—and just as PM1 was later found to have wrongfully disputed those issues when Ms. Julian began receiving the OOS pay that PS1 contested once PS1 was removed as Ms. Julian's supervisor, and because Ms. Julian achieved completely favorable settlement with the Agency around the issue of earning OOS pay—so too, PS1 and other managers were also involved in these later acts of disparate treatment targeting Ms. Julian.

<u>Conclusion</u>

Based on the foregoing, Ms. Julian, by and through the undersigned, respectfully requests that the OFO reconsider its prior decision denying her appeal, and overturn the Agency's Final Agency Decision in this case.

July 29th, 2020

Whistle Blower/Representative:

I am enclosing the emails that I have sent to try and get our back pay for the Out of Schedule money that we are owed by the Postal Service.

I had to pursue payroll/accounting services/ and Eagan to try to find out what we needed to do to get the back pay since a judicial judge and labor relation specialists from the postal service said they had nothing against us to warrant a case and the post office had to dismiss collecting money from us and issuing us weekly letter of demands.

After I went thru the channels, I emailed Fort Worth Finance and sent them the same information that I am sending you. We got ZERO cooperation from our Fort Worth District in Texas, so I went above them to ask questions on how to get the back pay money. It has already been 6 months since BOTH judges dismissed our cases and NOTHING had been

done to date. PLEASE, if you can do anything to help us, I would be eternally grateful for any and all help for Sharon Drummond and myself, since this harassment, retaliation, intimidation, and discrimination has been ongoing since 10/01/2016.

That is a VERY long time when dealing with it daily. Any and all consideration would be greatly appreciated!

Thank you,

Jennifer T Julian
Scotland, Texas
76379

940-733-2541 (cell)
940-541-2202 (work)

Sent: Saturday, October 01, 2016 3:13 PM
Subject: 2016-091 - Part Time Postmasters (PTPM, D/A 38-0) being converted to NTFT (D/A 2xx)...

# To TACS Coordinators...

## This is an FYI...

Please share this with local Human Resources, local Operations and any/all impacted offices...

We have been advised that many Part Time Postmasters (PTPM, D/A 38-0) were converted to Non-Traditional-Full-Time (NTFT, D/A 2xx) positions effective today. We suspect not every PTPM was converted effective today, so please ensure the actions suggested below are performed on an, as needed, ongoing basis.

It is critical that these employees are assigned to positions that accurately reflect the true schedules they are being assigned to work.

The local office can check the schedule assigned to the newly converted employee by

* checking the schedule displayed in the Employee Maintenance Module on the TACS application
    o see instructions below

    OR

* reviewing the HR to TACS Report for accuracy
    o see Timekeeping SOPs located on the TACS Home Page
    o this report can be set up as a subscription to run every day automatically

* TACS Coordinators should feel free to contact HQ Payroll regarding this message
    o List of TACS Coordinators is posted on the TACS Coordinator page which can be accessed from the TACS Home Page

* This is a SEND ONLY email account
    o Please do not respond to this email or send emails to the HQ PAYROLL - TACS email account
    o The inbox for this account is not monitored and emails sent to it will not be read or responded to

2



Thanks
HQ Payroll

Please have the schedule checked for every former PTPM that was converted to NTFT.

Included below are instructions to assist in quickly checking their schedule in the TACS application using the Employee Maintenance Module.

If *any part* of their schedule is incorrect, local HR must be contacted immediately to get this corrected.

Failure to have these schedules corrected ASAP can/will result in these employees being paid incorrectly... or not at all.

(1) In TACS, choose Employee from the top toolbar, and then select Employee Maintenance... from the dropdown menu.

| System | Site | Time | External | Reports | Switch | Help | Window |
|---|---|---|---|---|---|---|---|
| USPS Badge Maintenance | | | | | | | |
| TAC0 Employee Maintenance | echin v3.003 | | Home Module | | | | 01-Oct-2016 Restricted Inform |
| Badge Reports | | | | | | | |
| Employee Reports... | | | | | | | |

(2) Enter their 8-digit EIN (including leading zero) and hit the tab key once.
    a. Or use the Find option

TAC500F0    Employee Maintenance Module    01-Oct-2016 Restricted Inform.

Employee

Employee ID:          Name (Last,First,MI):

Start Pay Period:                     Automatic Higher Level Indicator
    Start Date:                       Borrowed Employee Indicator
Employee Status:  ACTIVE EMPLOYEE
        City Time Collection:  Clock    Time Card

(3) Choose the Daily Schd (IDS/IOS) tab.

TAC500F0    Employee Maintenance Module    01-Oct-2016 Restricted Informa

Employee   Job Asgn/Avlty (JA/JAS) | Daily Varied Schd (JVS)  Daily Schd (JDS/JOS) | Prior Assignments | Leave Infor

3

(4) Use the Diff Wk/JA button (provided it is not greyed out) on the right side of the screen to toggle between the various Job Weeks until you see
 a. **Job Assignment Type Code = B, _and_**
 b. **Effective Start Date = 2016-21-1**



(5) Double-check daily hours on the left side of screen ensuring you verify the accuracy for **EACH** day
 a. BT = Schedule Begin Tour **(Start Time)**
 b. ET = Scheduled End Tour **(End Time)**
 c. BL = Begin Lunch (the time the employee is scheduled to go to lunch)
 d. LD = Scheduled Lunch Duration
   i. Check the BT, ET, BL and LD for **EACH** day
 e. SDO column checked indicates Scheduled Day Off.
   i. You can disregard the BT, ET, BL and LD on Scheduled Days Off.

(6) Report any/all schedule discrepancies to local HR. A permanent fix to a schedule requires an HR action. Please ensure all corrections include the schedule assigned to the employee, as well as the position the employee is assigned to.

4

















Hey, can you do me a huge favor? The next time you have a big mailing like that will you text or call me the night before? I want to come to Scotland and surprise Jennifer and 🤍 I'd really appreciate it 🤍 while she here to you

You have no idea how much they help Cyndee! I want to

You're welcome.

You have no idea how much they help Cyndee! I want to make sure she appreciates you and continues to be nice. You are the biggest customer for that office and we absolutely appreciate you. That's why if you don't mind giving me a heads up, I'll speak over here that afternoon pure otherwise I'll keep just keep it going smoothly. Thank you so much!

Julian, Jennifer T - Scotland, TX

| | |
|---|---|
| From: | Julian, Jennifer T - Scotland, TX |
| Sent: | Friday, September 18, 2020 5:27 PM |
| To: | Julian, Jennifer T - Scotland, TX |
| Subject: | FW: RMPO - ROR HOUR CHANGES - NOT ACCEPTING AT THIS TIME |

From: Coghill, Christopher L - Fort Worth, TX
Sent: Wednesday, August 5, 2020 11:51 AM
To: Winn, Sid W - Fort Worth, TX <Sid.W.Winn@usps.gov>; Groves, Wendy M - Fort Worth, TX
<wendy.m.groves@usps.gov>; Schrock, Robert E - Fort Worth, TX <robert.e.schrock@usps.gov>; Garza, Diana D -
Pampa, TX <Diana.D.Garza@usps.gov>
Cc: Smith, Brandi D - Fort Worth, TX <brandi.d.smith@usps.gov>; Coghill, Christopher L - Fort Worth, TX
<Christopher.L.Coghill@usps.gov>; Dulka, Eric - Fort Worth, TX <Eric.Dulka@usps.gov>
Subject: RMPO - ROR HOUR CHANGES - NOT ACCEPTING AT THIS TIME
Importance: High

Sid, Wendy, and Bob,

Just got off of my District Retail Manager's telecom. Area Retail said that we are NOT to include any changes for our
RMPO offices. Stated that agreements were signed off stating we, the US Postal Service, would not make any additional
changes after the 2016 Final POST PLAN took effect.

Sorry...I will remove those from my current listing.

Chris

CHRISTOPHER L COGHILL | Manager | Retail
UNITED STATES POSTAL SERVICE | FORT WORTH DISTRICT
☏ Office (817)317-2727 ☏ Work Cell (682)252-9053 | 🖷 (817)317-2777 |
✆ christopher.l.coghill@usps.gov

*COULD not Abolish*
*NTFT Position*
*Still Coded as 210 -*
*never was changed*
*even After threatened with a*
*certified letter*

postalnews.com

# Arbitration

📅 September 22, 2014     🏷 NAPUS, postal, postmasters, POStPlan     💬 4 Comments

NAPUS and the LEAGUE have received Steven
Goldberg's arbitration decision on POStPlan. Both
organizations are deeply disappointed with the decision
and are still working through the details of the arbitration
document. Clearly this will have an impact on PMRs in
4-hour RMPOs, vacant 6-hour RMPOs and 6-hour
Postmaster positions in the future. We can be thankful that incumbent 6-hour Postmasters
(including those being RIF'd to 6-hour Postmaster positions), will keep their Postmaster
position as long as they do not vacate the office. Once these offices are vacated, they too will
be staffed by APWU employees.





Here is an overview of the arbitration:
* 2-hour RMPOs will stay staffed with PMRs
* 4-hour RMPOs will be staffed with APWU PSEs. The PMRs in these offices will have the
opportunity to take the test and apply for the positions.
* 6-hour RMPOs will be staffed by NTFT employees or traditional employees. Those offices
with incumbent Postmasters, including those accepting their own office as a RIF offer with a
reduction to 6 hours, will stay in the jobs until vacated (cannot abolish)
* PTPOs 6-hour offices will stay staffed with a Postmaster. These offices were not part of the
arbitration decision since they still have all of the Postmaster administrative responsibilities.

When any RMPO or PTPO is evaluated and increases to a Level 18, the office will then be
posted and filled by a non-bargaining employee and managed by a Postmaster.

All Level 18 offices will be staffed with PTFs instead of PSEs, ending the staffing issues for
many Level 18 Postmasters.

Both Postmaster organizations continue to review the POStPlan Arbitration. Clearly the fact
that Postmaster administrative duties were removed from the 6-hour Postmaster positions and
the 4-hour RMPOs weighed heavily on the arbitrator's decision.

We will keep you posted as to further developments regarding the arbitration as well as the
timeline for conversion of the 4-hour RMPOs from PMR to PSE employees.

Read more: NAPUS.

Posted By: Brian Sheehan.

← OIG says USPS understaffed Iowa City PO, resulting in
excessive letter carrier overtime

Mail Handlers Challenge Planned Closures and
Consolidations via National Level Grievance →



**RECENT POSTS**

Congressman introduces bill to honor
Vietnam War hero with semi-postal
stamp aiding veterans

Package Stuck in USPS Limbo Travels
Over 8,000 Miles

Portland OR postal workers go to the
aid of a customer in distress

Top postalnews.com stories of the week
January 13-19

Fresno mail truck carjacking suspect
arrested after breaking into a business

**SEARCH**

[Search ...]            SEARCH

**ARCHIVES**

Select Month

1/22/2019  4:14 PM


UNITED STATES
POSTAL SERVICE

October 1, 2018

Tracking number # 7017 2400 0001 0228 0316

Jennifer Julian                    EIN: 02305416
NTFT, Scotland PO, 000
562 7th St
Scotland, TX 76379

SUBJECT: Employee Notification – Abolishment of Duty Assignment

This is to advise you that due to changes in operational needs, your position, job number #71670267, as a NTFT clerk, will be abolished to meet the needs of the service effective Saturday, October 13, 2018 and you will become an unassigned regular. — *Against our Contract*

As an unassigned regular full-time employee, effective October 13, 2018, your regular schedule will be 0845 to 1625 with a one hour lunch from 1200 to 1300 Monday through Friday and on Saturday your schedule will be 0730 to 1230 with Sunday as your day off.

*Show up Be 8:45 to 4:30 M-F*

As an unassigned regular full-time employee, you are encouraged to bid on posted duty assignments for which you are eligible. If you do not bid, or are an unsuccessful bidder, you will be assigned to any residual assignment.

If you have any questions, please contact the Postmaster.

*Lea Farney*
Lea Anna Farney

Postmaster

cc: Local Union
    Human Resources

*Against Post Plan
2016 National Agreement

Impacted Postmasters
Are NTFTs until vacate
office*

Exhibit 11
Page 1 of 1

Julian, Jennifer T - Scotland, TX

| | |
|---|---|
| From: | ASES Notification <helpdeskaccounting-stlouis@usps.gov> |
| Sent: | Friday, July 24, 2020 2:48 PM |
| To: | Julian, Jennifer T - Scotland, TX |
| Subject: | Incident INC000026006179 has been resolved. |



### Accounting Services Customer Service
### Customer service is our passion; quality is our mission.

We take pride in providing excellent customer service and hope that you were pleased with the service provided by our Accounting Services representative.

The Accounting Services representative provided the following information as a resolution to INC000026006179:

**Summary:**
> Payroll--judgement or backpay

**Notes:**
> There was a case that went before a judge granting her back-earned wages. She was told TACS and WEBCOINS corrections needed to be made but they've only been made as of recently and she is unaware if they were backdated.

**Resolution:**
> Jennifer,
> Thank you for contacting the Accounting Help Desk with incident 25998871 - Payroll History Correction.

> As we discussed, the Accounting Help Desk (AHD) does not have access or clearance to timekeeping applications and corrections. (TACS/WEBCOINS) - refer to local management and local TACS Coordinator for an hours history correction. If the hours history or form 50 was not filed correctly at the time, adjustments will need to be submitted for incorrect time keeping (Adjustpay or ps form 2240) or in the event of an incorrect form 50 - local HRSSC will need to file the appropriate paperwork for a backdated form 50 to be processed.

> In the event that there is no assistance in this you may need to reach out to the local or national level of the union or the state labor board and the judicial team who have handled this case.

> If the local TACS Coordinator or Local Management needs to confirm this information with the AHD, they can reach us at 1/866-974-2733 and reference the above mentioned incident number.

Sincerely,

Manager, Accounting Help Desk

1



**UNITED STATES POSTAL SERVICE ®**

*JUDICIAL OFFICER*

2101 WILSON BOULEVARD, SUITE 600
ARLINGTON VA 22201-3078
703-812-1900 FAX: 703-812-1901

In the Matter of the Debt Collection Act Petition

JENNIFER T. JULIAN,
    Petitioner,

    v.

UNITED STATES POSTAL SERVICE,
    Respondent.

February 12, 2020

P.S. Docket No. DCA 19-263

APPEARANCE FOR PETITIONER:    Stephanie Williams

APPEARANCE FOR RESPONDENT:    Maria L. Franquez
Labor Relations Specialist

## DISMISSAL

The parties have submitted a joint *Agreement*, which resolves all the issues contested in this matter. Accordingly, the Petition is dismissed.

Diane M. Mego
Administrative Judge

FEB 12 2020

In the Matter of the Administrative Officer Petition

JENNIFER T. JULIAN,
    Petitioner,

v.

UNITED STATES POSTAL SERVICE,
    Respondent.

February 5, 2020

P.S. Docket No. DCA 19-265

## AGREEMENT

THIS AGREEMENT is between Respondent, United States Postal Service, and Petitioner, Jennifer T. Julian.

WHEREAS Ms. Julian filed a Petition where the United States Postal Service Judicial Officer ("Judicial Officer") challenging the Postal Service's claim that Ms. Julian owed the Postal Service a debt relating to her employment with the Postal Service in the amount of $3,617.21 for Letter of Demand Invoices for Out of Schedule Premium collected erroneously as detailed in Postal Service Invoice #703000693, 703000636, 703047165.

WHEREAS Ms. Julian and the United States Postal Service have reached an agreement that, with the intention to be legally bound, as follows:

1. The United States Postal Service dismisses the claim to attempt to recover the Out of Schedule premium paid to Ms. Julian.
2. Ms. Julian is not obligated to pay the invoices that total $3,617.21 attempting to collect the Letter(s) of Demand for the Out of Schedule Premiums issued to her in Invoice #703000693, 703000636, and 703047165.

Petitioner, Ms. Julian, understands that she owes the tax portion of the $3,617.21, since it was reported as income to the Petitioner.

By: _____
Maria Hostler
South Florida District
On Behalf of Respondent

By: _____
Jennifer T. Julian
Petitioner

DATE: 02/05/2020

DATE: 2/5/2020

FEB - 5 2020

**UNITED STATES POSTAL SERVICE ®**

*JUDICIAL OFFICER*

*2101 WILSON BOULEVARD, SUITE 600*
*ARLINGTON VA 22201-3078*
*703-812-1900 FAX: 703-812-1901*

In the Matter of the Debt Collection Act Petition

| | |
|---|---|
| JENNIFER T. JULIAN, )<br>Petitioner, )<br> )<br>v. )<br> )<br>UNITED STATES POSTAL SERVICE, )<br>Respondent. ) | February 4, 2020<br><br><br><br>P.S. Docket No. DCA 19-263 |

## ORDER

Petitioner has filed a motion to amend the docket to include an additional Letter of Demand for $437.05. The Postal Service agrees to the amendment. The motion is granted.

Petitioner also states that the parties have "reached a settlement...that includes all 3 of the invoices." Based on this representation, this matter is suspended to allow the parties to finalize their settlement. No later than February 21, 2020, the parties will file either a status report or a motion to dismiss based on settlement.

*Diane M. Mego*
Diane M. Mego
Administrative Judge

FEB - 4 2020



**UNITED STATES POSTAL SERVICE** ®

**JUDICIAL OFFICER**

2101 WILSON BOULEVARD, SUITE 600
ARLINGTON VA 22201-3078
703-812-1900 FAX: 703-812-1901

In the Matter of the Debt Collection Act Petition

| | | |
|---|---|---|
| JENNIFER T. JULIAN, | ) | January 15, 2020 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES POSTAL SERVICE, | ) | |
| Respondent. | ) | P.S. Docket No. DCA 19-263 |

## ORDER AND MEMORANDUM OF TELEPHONE CONFERENCE

On December 20, 2019, I held a telephone conference with Petitioner Jennifer T. Julian, her representative, Stephanie Williams, and Maria L. Franquez, representing the Postal Service.

Ms. Julian has chosen to proceed under the Debt Collection Act and withdrawn her grievance. Accordingly, Ms. Franquez will file an appropriate answer no later than January 31, 2020.

The parties agreed to discuss settlement. Ms. Williams will contact Ms. Franquez at a later date. If the parties reach a settlement, or if an extension for the time to file an answer would be appropriate to give the parties time to hold meaningful discussions, they should promptly inform my office or request an appropriate extension.

Diane M. Mego
Administrative Judge

**UNITED STATES**
**POSTAL SERVICE ®**

**JUDICIAL OFFICER**

2101 WILSON BOULEVARD, SUITE 600
ARLINGTON VA 22201-3078
703-812-1900 FAX: 703-812-1901

In the Matter of the Debt Collection Act Petition

| | |
|---|---|
| JENNIFER T. JULIAN,<br>Petitioner, | )<br>)<br>) December 20, 2019 |
| | )<br>) |
| v. | )<br>)<br>) |
| UNITED STATES POSTAL SERVICE,<br>Respondent. | )<br>)<br>) P.S. Docket No. DCA 19-263<br>) |

## ORDER AND MEMORANDUM OF TELEPHONE CONFERENCE

On December 20, 2019, I held a telephone conference with Petitioner Jennifer T. Julian, her representative, Stephanie Williams, and Maria L. Franquez, representing the Postal Service.

Ms. Julian filed a Petition regarding two alleged debts, one for $43.60 and another for $3,136.56, both of which she also grieved. During the telephone conference, Ms. Franquez checked the grievance system and confirmed that the grievance regarding the $43.60 was settled in Ms. Julian's favor, but the grievance regarding the higher amount is still pending.

Under the relevant ELM provisions, an employee has a choice of initially contesting an alleged debt either through the grievance procedures or through the Debt Collection Act hearing procedures, but not both simultaneously.

Accordingly, no later than January 3, 2020, Ms. Julian will file a status report stating whether she wants to move forward with her Petition in this case or proceed with

the grievance. If she determines she wants to proceed with the Petition, she should provide a written statement confirming that she has withdrawn the grievance relating to the assessed debt.

Diane M. Mego
Administrative Judge

**UNITED STATES**
**POSTAL SERVICE ®**

**JUDICIAL OFFICER**

2101 WILSON BOULEVARD, SUITE 600
ARLINGTON VA 22201-3078
703-812-1900 FAX: 703-812-1901

In the Matter of the Debt Collection Act Petition

| | |
|---|---|
| JENNIFER T. JULIAN, ) | October 9, 2019 |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| Respondent. ) | P.S. Docket No. DCA 19-263 |

## ORDER TO FILE ANSWER

The Notice of Docketing directed the Postal Service to file an answer to the

Petition by October 2, 2019. To date, however, the Postal Service has not filed an

answer.

Accordingly, by October 25, 2019, the Postal Service must file an answer.

Failure to respond to this Order may result in an order to show cause why the Petition

should not be granted.

*Diane M. Mego*

Diane M. Mego
Administrative Judge

38 pages
#8



**UNITED STATES POSTAL SERVICE** ®

*JUDICIAL OFFICER*

*2101 WILSON BOULEVARD, SUITE 600*
*ARLINGTON VA 22201-3078*
*703-812-1900 FAX: 703-812-1901*

In the Matter of the Debt Collection Act Petition

JENNIFER T. JULIAN,
    Petitioner,

    v.

UNITED STATES POSTAL SERVICE,
    Respondent.

September 18, 2019

P.S. Docket No. DCA 19-263

## ASSIGNING ORDER

This proceeding is assigned to Administrative Judge Diane M. Mego as the hearing official under § 5 of the Debt Collection Act of 1982, as amended, and as implemented by 39 C.F.R. Part 961.

Alan R. Caramella
Acting Judicial Officer

APPEAL TO THE FINAL AGENCY DECISION

UNITED STATES POSTAL SERVICE
EQUAL EMPLOYMENT OPPORTUNITY CASE
IN THE MATTER OF:

Jennifer T. Julian,                    Agency Case No. 4G-760-0086-18
Complainant

v.

Megan J. Brennan,                      Formal Filed: November 30, 2018
Postmaster General,
c/o Southern Area
Respondent.

CLAIM #1: ON DATES TO BE SPECIFIED, YOU WERE DENIED OUT OF
SCHEDULE (OOS) PAY.

According to the statements given by Sid Winn and Lea Farney, the two
are in contradiction of each other. Lea Farney states that Sid Winn
concurred with her decision to cease the payments for the Out of
Schedule (OOS) pay that is due a clerk working outside the hours
associated with job assignments, yet Sid Winn attested that only Lea
Farney was responsible for the denial of my OOS compensation. In the
next question, Sid Winn states that he did consult with Lea Farney
about the OOS time. It is my understanding with these responses to the
questions they are both responsible for this claim.
The reason that both Sid Winn and Lea Farney stated was the reason as
to why being denied the OOS was Article 8.4.B, which relates to

overtime (OT) pay not OOS pay. OOS pay is addressed in the ELM Section 434.6. OOS pay is relevant to Full Time Regular (FTR) and NTFT clerks.

Section 4. B. Overtime shall be paid to employees for work performed only after eight (8) hours on duty in any one service day or forty (40) hours in any one service week. Nothing in this Section 23 Article 8.5 shall be construed by the parties or any reviewing authority to deny the payment of overtime to employees for time worked outside of their regularly scheduled work week at the request of the Employer.

434.6 Out-of-Schedule Premium 434.61 Policy 434.611 General Out-of-schedule premium is paid to eligible full-time bargaining unit employees for time worked outside of and instead of their regularly scheduled workday or workweek when employees work on a temporary schedule at the request of management.

434.612 Timely Notice Payment of out-of-schedule premium is dependent on timely notice being given by management of the temporary schedule change, as follows: a. If notice of a temporary change is given to an employee by Wednesday of the preceding service week, even if this change is revised later, the employee's time can be limited to the hours of the revised schedule, and out-of-schedule premium is paid for those hours worked outside of and instead of his or her regular schedule.

434.613 Pay Administration 174 ELM 46 b. If notice of a temporary schedule change is not given to the employee by Wednesday of the preceding service week, the employee is entitled to work his or her regular schedule. Therefore, any hours worked in addition to the employee's regular schedule are not worked "instead of" his or her regular schedule. The additional hours worked are not considered as out-of-schedule premium hours. Instead, they are paid as overtime hours worked in excess of 8 hours per service day or 40 hours per service week.

434.613 Application Out-of-schedule premium hours cannot exceed the unworked portion of the employee's regular schedule. If employees work their full regular schedule, then any additional hours worked are not "instead of" their regular schedule and are not considered as out-of-schedule premium hours. Any hours worked that result in paid hours in excess of 8 hours per service day or 40 hours per service week are to be recorded as overtime (see 434.1).

434.614 Examples See Exhibit 434.614. Example: An employee is notified by Wednesday of the preceding service week to work a temporary schedule the following service week from 6:00 a.m. to 2:30 P.M., instead of his or her regular schedule from 8:00 a.m. to 4:30 P.M. The employee is paid 2 hours out-of-schedule premium for the hours worked from 6:00 A.M. to 8:00 A.M. and 6 hours' straight time for the hours worked from 8:00 A.M. to 2:30 P.M. If in this situation the employee continues to work into or beyond the balance of his or her regular schedule (2:30 P.M. to 4:30 P.M.), then he or she is to be paid for hours worked in accordance with Exhibit 434.614. Example: An employee's regular schedule is Monday through Friday and he or she is given a temporary schedule of Sunday through Thursday. The hours worked on Sunday are out-of-schedule premium hours provided they are worked instead of the employee's regularly scheduled hours on Friday. If, however, the employee also works his or her regular

schedule on Friday, then there can be no out-of-schedule premium hours; the hours worked on Sunday would be paid as regular overtime hours worked in excess of 40 in the service week. Exhibit 434.614 Computing Out-of-Schedule Premium Hours Hours Worked Total Work Hours Out-of-Schedule Premium Hours Straight Time Hours Overtime Hours 6:00 AM--2:30 PM 8 2 6 0 6:00 AM--3:30 PM 9 1 7 1 6:00 AM--4:30 PM 10 0 8 2 6:00 AM--5:30 PM 11 0 8 3 Pay Administration 434.622 March 2019 175 434.62 Eligibility 434.621 Eligibility for Out-of-Schedule Premium Exhibit 434.621 indicates those employees who are eligible to receive out-of-schedule premium while working a qualifying temporary schedule within a bargaining unit or while detailed to a nonbargaining position (see exceptions in 434.622).

Sid Winn averred that I was notified on my PS Form 50 the hours of my job function after PostPlan. I have attached the 3 PS 50 that are in regards to my accepting the voluntary downgrade in lieu of reduction in force separation. The PS 50 does not indicate schedule hours the form only has the position number 71670267.

Lea Farney indicated that she was appointed Postmaster after I accepted the downgrade but according to the USPS website Postmaster Finder, she was appointed Postmaster on 08/08/2015 more than a year prior to my POStPlan downgrade. (attached)

In response to Jean Rusk initial interview with regarding this EEO at the local level, Lea Farney on 9/11/2018, indicates that WEBCOINS and TACS should match and need to be corrected, also Sid Winn's response to the same question on 8/31/2018, explains that instead of setting the correct hours in the systems they were arbitrarily set yet almost a year later and they still have not been corrected.

Lea Farney stated that when she was appointed Postmaster of Henrietta that I entered my own time in TACS, this is correct since I was still the Postmaster of Scotland a level 13 station, it wasn't until October 1, 2016, when I accepted the downgrade to the NTFT clerk position that I ceased entering my time. After Lea Farney stated in the email sent on August 7, 2018, she still approved and paid me the OOS pay for 4 weeks, 2018-21-1, 2018-22-2, 2018-25-1, 2019-2-2. If I was not due the OOS then why did she enter it into the TACS system?

I never entered OOS hours into the TACS system for myself.
On July 20, 2019, I was issued a PS 50 that changed my work hours to 37.5 but my bid assignment has not been changed. This is the number of hours that the office is open according to the Facilities Data Base (FDB).

However, since Lea Farney has been replaced in the Henrietta Post Office with Office in Charge (OIC) Deena Grant (6/13/2019) and Louisa Bell (6/27/2019), I am now receiving the OOS pay worked each week for the hours outside my job assignment. (attachments pay stubs for pay periods 14, 15, 16, 17, 18-2019) Sid Winn is also the immediate supervisor for Louisa Bell.

CLAIM 2: ON A DATE TO BE SPECIFIED, MANAGEMENT TOLD YOU THAT YOU CANNOT SPEAK TO ANYONE.

Email sent from Lea Farney on October 13, 2017, in the body states that "I will be sending you a copy of those duties in the near future, if there are any questions or concerns please feel free to discuss with myself or Mr. Winn as I will be out of the office for the next few days." We never received the duties referenced in this email. Then in the emails sent on July 31, 2018 from Christina Melton and the one from Lea Farney on August 21, 2018, state not to talk to Sid Winn. It is difficult too understand instructions I am to follow.

CLAIM 3: ON A DATE TO BE SPECIFIED, YOU WERE TAKEN OFF YOUR DETAIL.

According to Sid Winn's explanation the Henrietta Post Office was incurring OT for the clerks, however, they continue to use OT weekly as

the FTR is utilized to work Saturday instead of using the PTF clerk. The FTR has Sat/Sun off and when scheduled to work their Scheduled Day Off (SDO) they are entitled to OT. Furthermore, in his explanation, he indicates that a detail assignment is for 90 days, yet when I was detailed to the Fort Worth District Business Connect Coordinator it was from July 2015 thru May 2016, which exceeded the 90 days.

I have attached the eFLASH reports for various weeks for the period I was on the detail at the Stephenville Post Office for both the Henrietta and Scotland offices. The reports reflect why there was such an excess of OT at the Henrietta office, Lea Farney failed to transfer the PTF clerks' hours to the appropriate finance code when entering into TACS at the end of the week. Since the PTF is assigned to the Henrietta office, every time she fills in at the Scotland office the hours should be transferred to the appropriate finance number. This is another process that is to be completed in TACS. When I was on the detail my hours where transferred to the Stephenville office. Since Lea Farney did not transfer the hours appropriately it reflects few to zero, in some weeks, hours used at the Scotland Post Office. So, for Sid Winn to say that the OT was exorbitant for the Henrietta office is false, as a manager he should have also recognized this mistake.

## CLAIM 4: ON DATES TO BE SPECIFIED, MANAGEMENT TALKED NEGATIVELY ABOUT YOUR WORK PERFORMANCE.

ARTICLE 3 MANAGEMENT RIGHTS The Employer shall have the exclusive right, subject to the provisions of this Agreement and consistent with applicable laws and regulations: A. To direct employees of the Employer in the performance of official duties; B. To hire, promote, transfer, assign, and retain employees in positions within the Postal Service and to suspend, demote, discharge, or take other disciplinary action against such employees; C. To maintain the efficiency of the operations entrusted to it; D. To determine the methods, means, and personnel by which such operations are to be conducted; E. To prescribe a uniform dress to be worn by designated employees; and 6 Article 3.F F. To take whatever actions may be necessary to carry out its mission in emergency situations, i.e., an unforeseen circumstance or a combination of circumstances which calls for immediate action in a situation which is not expected to be of a recurring nature. (The preceding Article, Article 3, shall apply to PSEs)

According to Lea Farney she was exercising her management rights to direct employees in the performance of my official duties, however, I had printed the placards that I use on a daily basis prior to lunch as I did and still do every day. Lea Farney did not ask if I had printed the placards earlier in the day. As it states in Article 3.f.f an unforeseen circumstance or a combination of circumstances which calls for immediate action in a situation which is not expected to be of a recurring nature. The late customer in question on this date generally mailed 5-10 parcels each day. This particular day she had an exceptionally large mailing with 45-55 parcels.
Unfortunately, after this customer was harassed by Lea Farney and Carolyn Gibbs from a bar one night she has switched her business to UPS and FedEx. The customer attempted to report the incident to Sid Winn and he implied to her that she was not harassed and that Carolyn Gibbs and Lea Farney had every right to contact her regarding the massive mailing on this day, even though this is a violation of the Postal Service's social media policy.

CLAIM 5: ON DATES TO BE SPECIFIED, YOU WERE INSTRUCTED TO PERFORM WORK OUTSIDE OF YOUR JOB DESCRIPTION

According to the National Labor Relations Act of 1935, Section 8.4.D, forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

According to the APWU National Contract, cleaning is a custodial function and not a function for a SSDA NTFT clerk. The Scotland Post Office was converted under POStPlan on October 1, 2016 to the RMPO

under Henrietta Post Office. It was not until February 23, 2019 that Lea Farney finally contracted a cleaner through San Mateo Contract Cleaner Unit. However, Lea Farney never instructed the contracted cleaner of the duties required of her. The contract cleaner still to this day asks me what to do when she does show up, which is not on a regular basis nor with any consistency as to the amount of time she stays to clean the facilities. It is not the job of a NTFT Clerk to instruct the contract cleaner on the duties that are required. This could be a circumstance where Lea Farney should exercise her use of Article 3, Managements Rights.

CLAIM 6: ON DATES TO BE SPECIFIED, MANAGEMENT QUESTIONED YOUR INTEGRITY.

Several of the employees at the Henrietta Post Office reported to me that PTF Carolyn Gibbs and Lea Farney are the employees that discussed my alleged DUI/DWI charges. Once again management has violated the Zero Tolerance Policy and there are not repercussions for the blatant violation. Sid Winn having first hand knowledge of the hearsay and took the low road and attempted to belittle me with playground gossip. Management is continuously allowed to violate the Zero Tolerance Policy with no retribution to those making false claims about my private life.

CLAIM 7: ON DATES TO BE SPECIFIED, MANAGEMENT ACCUSED YOU OF WRONGDOING.

This ties into CLAIM 4 and CLAIM 6. A large volume customer from the Scotland Post Office attempted to contact the management team within the USPS to report harassment. Sid Winn decided without investigation that it is not harassment, since the Postmaster was at a bar messaging the customer and posting selfie pictures kissing the PTF clerk from the office, then deny the allegations in an EEO disposition,

CLAIM 8: ON DATES TO BE SPECIFIED, MANAGEMENT DID NOT
ACCOMMODATE YOUR MEDICAL RESTRICTIONS IN REGARD TO WORK
HOURS.

At the end of the day only allowing me 15 minutes or less to close the
unit is unrealistic since at the RMPO, Scotland Office, I am required to
do many functions that are the APO Duties/Responsibilities under
POStPlan. I have attached a power point that explains these points.
According to the power point the APO is required to do the following
items (attached):
DAILY
Check MYPO before 9:00am and before 3pm (2xdaily)
Check outlook (emails)
Check carrier cases for "sleepers" and record on log sheet
Update timecards (clerk PS 1236, Rural PS 4240)
Assign and clear carriers of accountable and keys
Compile Unit PS 1412 and verify supporting documentations
Verify all employees are wearing badges
Verify all EXFC mail is processed and delivered
Verify building is secure after all carriers have departed
(if Applicable) Verify station input
Prepare Register for dispatch
Assure all mail is dispatched (CFS/LOOPS)
Collections at designated times and run reports
If postal vehicles, verify they are locked and present
Secure key accountability/MO machines in safe
Secure safe, locked cabinets and building, and set alarm
WebBATS as needed
WEEKLY
Total and submit timecard
Fill employee stamp orders
eFLASH/Webis every Friday

Hour transfers

Prepare next week's work schedule

MONTHLY/Accounting Period

Box rent notices in boxes by the 10th of the month

Close all unpaid boxes on the 10th of the month

Complete the Aviation Security Audit

EXCF Audit Monthly

AMS Audit report/Check NO Stat/vac./and fax

Vehicle Inspection Audit

Empty copier of coins and record in AIC 123 at the end of the month

Report copier reading on internet

Send in stamp order

Review PS Forms 3972 (Absence Analysis)

Audit Change fund

Check eBUY and certify utility bills

eTravel

QUARTERLY

Verify driver's license

Audit retail stock (packaging/etc.)

Audit Clerk accountabilities (must be completed with in the first two months of every quarter)

SEMI ANNUALLY

Verify Key Logs, building facility keys, PS Forms 3977's

ANNUALLY

Collect Annual Fees (permit imprint, second class, business reply)

Examine and verify locks and keys for clerk drawers (F-1 433.27)

Verify Main Stock

Audit CPU's (Contract Postal Units) if applicable

Housekeeping audit

Security audit

If I were not required to do all of the functions that the APO is responsible to do, it would be more achievable to end my day in the 15 minutes allotted by Lea Farney and Sid Winn. I have created my own daily checklist as there are numerous tasks that have been dumped onto the RMPO. If the APO did their required tasks (as stated above) I would be responsible for taking down the American flag, scanning the required scans that correspond with dispatch and the end of the day and sending and email to the APO indicating that they need to complete their End of the Day tasks.

CLAIM 9: ON OCTOBER 13, 2018, YOUR BID ASSIGNMENT WAS ABOLISHED.

According to Lea Farney's response she cites Article 37.3.a.4 of the APWU contract, within her abolishment letter that she sent by certified mail the new hours she defines for my job assignment has the total hours for the week going from the current 36.5 to 38.3, which is an increase of 1.8 hours. In the Article that Lea Farney cites *(6) When the total hours in the work week of a non-traditional full-time assignment are changed, the assignment shall be reposted.* The APWU contract also states that this must be done in a 28-day period, but it wasn't until November 27, 2018 that I received a RECIND letter. Had Lea Farney followed thru with the abolishment of the job utilizing the hours she stated on the abolishment letter, in a timely manner, it would have corrected my job assignment to eliminate the Out of Schedule (OOS) time that I am allowed at the current time. If the assignment did not need correcting then why even start the process?

CLAIM 10: ON DATES TO BE SPECIFIED, YOU WERE HARASSED BY CO-WORKERS.

Sid Winn advised that he was not aware that I felt harassed because it was never reported to him, yet in the October 17, 2017 email he was included in the recipient list. Sid Winn never reached out to me after this incident. I was asking for union representation at that time and the union steward, D. Newsome, refused to assist me with the matters. The April 23, 2018, incident was Sid Winn listening to gossip from the PTF, Carolyn Gibbs, and Lea Farney that I had received a DUI/DWI. I sent an email to clarify the reason he came to the office in an email and he never once apologized for accusing me of wrong doing.

When Lea Farney and Carolyn Gibbs, PTF, sent messages via social media Facebook Messenger, I sent it to Sid Winn and asked him to investigate since the customer felt harassed herself. At the same time stamp that the messages were sent to the customer, Lea Farney and Carolyn Gibbs had posted a selfie of the two of themselves kissing at a bar, Stick's Place. In my opinion if you look at the photo it appears that Lea Farney could be slightly under the influence. Did Sid Winn ask her in front of customers at the retail counter if she had consumed alcohol? But he felt it was acceptable to ask me just on hearsay.

When Lea Farney answered the questions to the disposition she indicated that she did not see the October 7, 2017, email, yet she was a recipient of the email in question.

Sid Winn attested that regarding the April 23, 2018 visit he discussed with Lea Farney, yet she claims she had no knowledge of his visit. In regards to the August 24, 2018 incident at the bar she denies, yet it was posted on Facebook social media as Carolyn Copas Gibbs is attending RIP at Stick's Place with Lea Anna Farney. On Stick's Place Facebook page, they have identified themselves as a Live music venue – Dance and Night Club – Dive Bar.

I even requested from Donna Dunker, Manager of Human Resources, to do an IMIP due to all the harassment. Myself and Sharon Drummond, NTFT in Petrolia also under the APO Henrietta, were interviewed as were both Lea Farney and Sid Winn. I am confused as to how they neither one understood that I felt harassed. The Postal Service has a

Zero Tolerance Policy, yet I was given zero help to get the harassment to cease.

CLAIM 11: ON JANUARY 4, 2019, POSTMASTERS FARNEY AND PEZZANO DEMANDED THAT SHE SIGN PAPERS THEY PRESENTED TO HER ALLOWING THE AGENCY TO RECOVER OUT OF SCHEDULE PAY THAT SHE HAD PREVIOUSLY RECEIVED.

Lea Farney and John Pezzano were both aware of the ongoing EEO that was in regards to the Out-of-Schedule pay, yet they antagonized me by taking a different avenue to attempt to intimidate me and garnish my wages. Once again, I pose the question, If I am not entitled to OOS pay for time worked outside of my job assignment then why am I receiving the OOS pay at the current time? Had Lea Farney followed thru in a timely manner with the abolishment of my current position and posted the job with the new hours for me to bid on then none of this would have occurred. Lea Farney was continually trying to find ways to bully me. I have always treated her with a professional courtesy and respect, yet she does not reciprocate with the same. The bullying needs to stop per the Zero Tolerance Policy. Management needs to get my job assignment inline with the hours posted in the FDB and allow for the mail to be processed in a safe and timely manner.

CLAIM 12: ON January 8, 2019, SHE BECAME AWARE THAT MANAGEMENT HAD PROCESSED AN IMPROPER PAYROLL DEDUCTION FOR HER JANUARY 11, 2019, PAYCHECK WHICH DEDUCTED $155.28 FROM HER PAY.

I had filed a grievance to go thru those channels to resolve this manner, however, once again Lea Farney insisted that she use bullying tactics to resolve issues. I made the call to the Eagan Accounting to get the money issued back to me on the next paycheck. Mary Staub, Finance at

Fort Worth District, said that no funds had been withheld from my check, and D. Newsome, union rep, said it was an error and that all PSE's had the funds withheld, I am a NTFT clerk not a PSE. When I reached out to the union steward, and my postmaster, who included the district finance department, they were quick to jump to assumptions that the funds were not withheld from my pay. I showed them my paystubs and still they conspired against me to try to retain the illegally withheld funds. At this time no letter of demand had been issued to me, so when I became aware, I obviously wanted answers as would any other employee. As I stated I had to research and contact Eagan where I did receive the funds two weeks later.

CLAIM 13: ON February 22, 2019, WHEN SHE RECEIVED HER PAYCHECK, SHE BECAME AWARE THAT SHE HAD BEEN IMPROPERLY CHARGED 32 HOURS OF LWOP FOR HOURS THAT SHE WORKED.

I have worked for the Postal Service in some capacity since 1986 and it has not been until I filed the EEO that I received LWOP on any of my paystubs. Since filing the EEO there have been more than 3 times that Lea Farney incorrectly entered my time, or did not enter my time at all. A weekly task for the Postmaster is to verify that the hours for the employees at their unit(s) is entered properly. I am responsible for sending the timecard to the postmaster via email and I send it every Friday. Since I accepted the downgrade to NTFT clerk from postmaster, I have faxed my card to the Lea Farney every Friday, except during my detail, and it was only after I filed the EEO that my hours would somehow not get entered in a timely manner to receive the funds on the scheduled payday.

During my tenure with the United States Postal Service I have held many titles and I have held my head high and been proud to be an employee of the USPS. Starting in 1986 delivering mail out of the Holliday Post Office on the Highway Contract Route (HCR) to being the

Postmaster of the Scotland Post Office for 12 years and to taking the Fort Worth District to number 1 in the Nation in Revenue Sales as the Business Connect Coordinator from July 2015 to May 2016. During the time I held each of these positions I always treated my fellow coworkers as equals. It takes every position in the USPS to make it a viable operation, from custodians to District Managers we are all equals in this organization. We each deserve to be treated with respect and to not be talked down upon dependent on the job description on our PS Form 50.

For my health and my life, I need for the harassment and bullying to cease. My health cannot suffer any more of the tactics that Lea Farney and Sid Winn use to undermine the policies and procedures that the USPS has in place to provide a safe, healthy, and clean work environment. Attached to my original EEO is documentation from my physicians regarding the rapidly decline in my health due to all the excessive unnecessary and unwarranted stress from management. My medications have increased as my health deteriorated.

Since the POStPlan it is unrealistic to find comparable employees in the same unit, since with the implementation of POStPlan, many units only have one employee in the station with a Postmaster at a remote location. However, clerks are all covered under the same contract between the USPS and the APWU and a violation of the Zero Tolerance Policy should not be allowed just because there is only one clerk in the station. In the Final Agency Decision (FAD) it is made a point that the harassment and discrimination charges met most of the criteria needed to be classified as such charges, however, the main reason the FAD dismissed the claim was due to the fact that I am the only employee at the Scotland Post Office which is remotely managed by Lea Farney, Postmaster at Henrietta TX. Prior to POStPlan offices were managed on site not remotely, and since these changes have been made, I feel that the standards for meeting the criteria must also be changed. For the

past 29 months I have endured harassment and discrimination on a recurring basis and I am hoping that this appeal will bring the results needed to end this behavior. I am looking forward to the day I can go to work and not worry about upper management harassing and discriminating against me attempting to force me to retire or resign, since along with the accepted downgrade to a NTFT with the POStPlan, this is to be my position until I decide to retire, resign, or relocate on my terms.

She contacted P.T. worker
and told me Last of Sept. 2020
that they could Not Do Anything till

EEO was
Decided —
JD

Monica Grey
(whistle blowers name)
1-703-248-4697

fax 703-218-4616

Called 7:06 Am        Called
                      7/23/20
9/16/20               12:05M

Called 9/25/20  at 12:00noon

40 Pages

OIG - washington
whistle Blower

April 21, 2020                    *This guy was in charge of*

Mr. Robert J. Barnhart, Director of Compliance and Control Division   *Case*
Office of Federal Operations                                          *And Changed*
EEOC                                                                  *to Another*
Po Box 77960                                                          *pers*
Washington, DC 20013-08960

Agency Case Number #4G-760-0086-18 & # 4G-760-0092-19


Good afternoon Mr. Barnhart,

I am writing to you and the Office of Federal Operations to try and find out some important information.

I am wondering when a decision will be made on my 2 EEO cases that have been before the Division for over the 180 days that are allowed and required for a decision to be made at this level?

I am enclosing a copy of the Out of Schedule Pay decision that was made by an Administrative Judicial Judge out of Arlington, VA on the case of the OOS pay. It was dismissed because the Post Office representatives admitted that the Post Office had no case against me for the OOS pay, therefore, it was dropped, and the Post Office is to pay me the OOS pay that I am due to present day, because my schedule was never updated and completed in TACS and WEBCOINS, even to this date. Also, ALL letters of demands have been dismissed.

All the harassment, retaliation, discrimination, and blatant targeting of myself and my position within the postal service, was because of the MPOO2, Mr. Sid Winn, of the Fort Worth District, and his personal vendetta to force me out of my position so the Scotland Post Office could be downgraded further to a level 4 office. I am a very dedicated worker and have devoted my life and career to the post office. I had massive documentation to defend my position of this harassment and also, being a federal whistle blower has taken its toll on my well-being, health, and emotions, to say the least. Especially when I received a certified letter from the Post Office saying that I no longer had a job/position here and needed to start bidding on other assignments.

Since all of these instances have taken place, both of the Postmaster/OIC have been replaced. One was even demoted for what she did to me.

I just need to know, sir, how much longer will this be going on? I would like some sort of timeline, if possible, when the decision, whatever it will be, will be coming out of your office? Any information that you can provide to me would be greatly appreciated. It's just that I need closure on these cases so I can try to move forward and work on my declining and continued health issues because of this situation.

I appreciate all you do and have done for me and these cases.

Thank you again for your help!


Jennifer T Julian
PO Box 124
Scotland, Texas
76379

940-733-2541

July 29th, 2020



Whistle Blower/Representative:

I am enclosing the emails that I have sent to try and get our back pay for the Out of Schedule money that we are owed by the Postal Service.

I had to pursue payroll/accounting services/ and Eagan to try to find out what we needed to do to get the back pay since a judicial judge and labor relation specialists from the postal service said they had nothing against us to warrant a case and the post office had to dismiss collecting money from us and issuing us weekly letter of demands.

After I went thru the channels, I emailed Fort Worth Finance and sent them the same information that I am sending you. We got ZERO cooperation from our Fort Worth District in Texas, so I went above them to ask questions on how to get the back pay money. It has already been 6 months since BOTH judges dismissed our cases and NOTHING had been

done to date. PLEASE, if you can do anything to help us, I would be eternally grateful for any and all help for Sharon Drummond and myself, since this harassment, retaliation, intimidation, and discrimination has been ongoing since 10/01/2016.

That is a VERY long time when dealing with it daily. Any and all consideration would be greatly appreciated!

Thank you,

Jennifer T Julian
Scotland, Texas
76379

940-733-2541 (cell)
940-541-2202 (work)



September 28th, 2020

Please consider my record of evidence presented in this appeal with 55 pages of documentation attached to prove that I was actually harassed, discriminated against, belittled, and subjected to continual retaliation by management officials that represented the United States Postal Service by repeatedly charging me with LWOP, and then having to make adjustments to my pay check.

It has affected my daily work life, health, and my family because of the continued and unnecessary hostile work environment that I was subjected to on a daily and ongoing basis by management officials in the Postal Service.

The reason I filed the EEO on the LWOP I received on my paycheck on the June 24th, 2019 pay period , and the Letters of Demand, was because 3 managers in the Post Office had access to TACS at that office and the ONLY employees that received the LWOP, was myself and Sharon Drummond from Petrolia, TX, also actively involved in her own EEO suit.

My question still remains as to why EVERY employee's time was entered into TACS, including

the other RMPO office, which is Bluegrove, TX (no
EEO involvement), and every employee at the APO,
including the clerks, rural carriers, city carriers, subs,
and the Postmasters. Why were just "two"
employees times not entered correctly into TACS? Is
it because that they just happen to have active
EEO'S within the Postal Service? Sure makes me
wonder. Also, management enters time into TACS
usually on Friday and has until Monday to enter
corrections, but somehow, this was not done more
than once. Also, Postmaster Farney tells us in an
email attached, that a time certification sheet will be
sent to us every time our time is entered into TACS
for our records and verification purposes, which
NEVER happened. If management would follow their
own policies and procedures, we would NOT have
been LWOP'D.

I have been with the Postal Service in some way,
shape, or form for over 30 plus years, and can never
remembered being LWOP'D until the EEO'S were
filed and the harassment started.

I have been LWOP'D by Postmaster Farney on
numerous pay periods over a 3 year period. Please
see the records attached and you can see for
yourself that it has been on numerous occasions.

If it would have happened once or twice, maybe, but after that, it is not considered a mistake but a "choice" made intentionally by postal management to discriminate and harass an employee in a "protected class" since Post Plan 2016 and we took a Reduction in Force to stay in our offices as clerks.

Again, the APO employees were not LWOP'D during that particular pay period when Postmaster Farney was "gone" except for myself and Sharon Drummond, that just happen to have active EEO'S against the Postal Service. So, who entered the time into TACS for the "other" ten or so employees??

Put yourself in our shoes. Would you like it if your pay was messed up on numerous occasions and told that it was just a "mistake" after happening time and time again, when it had never happened before in our postal careers? As a past manager for the Postal Service for years, we are taught and "trained" to enter employee's times "correctly" every time because it is important that the employee gets paid properly with no mistakes and no unnecessary costly and time consuming adjustments would have to be made.

It was a choice made repeatedly by management over a 3 year period to ignore postal policy and

procedures, state and federal laws, EEO Policy
Statement, Zero Tolerance Policy and workplace
harassment to cause adverse effects on myself and
Sharon Drummond, which has led to numerous
serious health issues for myself as well as Sharon
because we are enduring retaliation for filing our
formal EEO cases.

I have attached numerous statements from doctors
showing and detailing how the daily stress at work
has affected my health over the years of the daily
harassment. Also, my husband wrote a letter
explaining how it effects our home life as well as our
four sons and their wives, and our precious
grandchildren.

This is why I have asked for compensation because
of all the added new medical expenses because of
the constant harassment with my job and pay.

Also, I have the decision that was dismissed by the
Postal Service as well as the Office of Federal
Operations, about the OOS pay the post office
garnished from our paychecks. I pulled the
grievance we had with the union because we had
absolutely NO help nor cooperation from our union
representative in our area. We had to file Step 1 and
Step 2 with help from Stephanie Williams, our EEO

representative. The union lady from our area and Postmaster Farney were friends outside the Post Office. They would speak to each other about the case amongst themselves before even consulting me or Mrs. Drummond. So, basically, we had to go thru the grievance process by ourselves with minimal assistance, even though, we were both union paying members.

We went before 2 different judicial judges and 2 different Head of Labor Relations Personnel within the Postal Service, and it was decided the Post Office had "NO" case against us for the OOS pay and the organization was ordered to pay us back the monies they had garnished from our paychecks, and all the Letters of Demands were dismissed.

The LWOP pay periods, not just this one in the EEO, but all of them were not done out of ignorance on management's part, but were done by "choice" and the "decision" to not follow their own rules and regulations about time certifications and to continue the harassment and retaliation of an exemplary employee named Jennifer T Julian, that has a name and a face, and continue to put pressure on me daily to force me out of the Post Office.

To summarize this appeal, I have proven and provided the exact documentation that I was clearly being violated by the Postal Service managers, in the forms of hostile work environment, retaliation, and harassment by the evidence of the documents that I have attached with this appeal. My only reason for filing this EEO appeal is because of the USPS failure to follow their own rules and regulations set forth by the organization and regularly and repeatedly posted by management. I have an impeccable career with the USPS and it is heart breaking to me that I have been subjected to such malicious treatment by upper management for years, and they hold absolutely "no" accountability for their actions for this harassing and discriminating treatment of myself. They definitely take care of each other as managers, and the employee suffers if they stand up for what is right and hold them accountable for the treatment they have dished out. I would never want other employees to have to endure or experience what I have suffered through over these last few years.

Any and all consideration for this appeal and the facts and documents I have enclosed with this case and claim, would be much appreciated!

Thank you very much for your time and attention to this matter!

Sincerely,

Jennifer T Julian

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff Archer
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Baylor
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
NA (Self)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[X] 1 U.S. Government
Plaintiff

[ ] 3 Federal Question
*(U.S. Government Not a Party)*

[ ] 2 U.S. Government
Defendant

[ ] 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [X] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [X] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

[X] 1 Original Proceeding

[ ] 2 Removed from State Court

[ ] 3 Remanded from Appellate Court

[ ] 4 Reinstated or Reopened

[ ] 5 Transferred from Another District *(specify)*

[ ] 6 Multidistrict Litigation - Transfer

[ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
Failure to Accomodate

Brief description of cause:
Harassment, Discrimination, And Retaliation No accomodation for injury

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 950,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [X] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE Diane M. Mego
DOCKET NUMBER DCA 19-263

DATE 06/03/2021

SIGNATURE OF ATTORNEY OF RECORD
(Self) Jennifer T. Julian

### FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____